Maria BROWNELL

v.

**STATE FARM MUTUAL INSURANCE COMPANY and Worldwide Auditing Services, Inc.**

No. 90–2224.

United States District Court, E.D. Pennsylvania.

Jan. 31, 1991.

---

Ronald Jay Smolow, Trevose, Pa., for plaintiff.

James J. McCabe, James T. Moughan, Melvin R. Shuster, Philadelphia, Pa., for Worldwide Auditing.

## MEMORANDUM

WALDMAN, District Judge.

### I. BACKGROUND

On February 23, 1990, plaintiff filed this action in Philadelphia Common Pleas Court, alleging RICO and civil rights violations, as well as several state law claims. Defendants timely removed the action to this court following service. Presently before the Court are defendants' motions to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), plaintiff's amended complaint filed in June of 1990.

Plaintiff is the insured under a policy issued by defendant State Farm Mutual Automobile Insurance Company ("State Farm"). On January 10, 1989, plaintiff was injured in a motor vehicle accident.[1] She sought medical treatment from Dr. Robert Bell and submitted his bills to State Farm. Relying on an assessment of plaintiff's claim by defendant Worldwide Auditing Services, Inc. ("Worldwide"), State Farm disallowed plaintiff's claim for benefits.

Defendant Worldwide is in the business of auditing the services that doctors and other health care providers render to persons claiming insurance benefits to determine whether the treatment provided was necessary and the cost reasonable. Plaintiff alleges that for over six years State Farm and Worldwide conspired summarily to reject, in whole or in part, claims based on soft tissue injury. She alleges that a contingency fee was paid by State Farm to Worldwide, based on a percentage of money saved, and that this fee was in effect a "kickback." Plaintiff alleges that her claim was rejected pursuant to this conspiracy.

### II. APPLICABLE LAW AND LEGAL STANDARD

In deciding a motion to dismiss for failure to state a cognizable claim, the court must accept as true all of plaintiff's factual allegations and draw from them all reasonable inferences favorable to the plaintiff. *D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984). A case should not be dismissed for failure to state a claim unless it appears that no relief can be granted under any set of facts that could be proved consistent with plaintiff's allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). A Rule 12(b)(6) motion may be granted as to portions of a complaint. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982); *Fielding v. Brebbia*, 399 F.2d 1003, 1006 (D.C.Cir.1968).

As to the applicable law, federal law governs the federal claims. As to the state law claims, the arguments of both parties are premised upon Pennsylvania law and Pennsylvania law will be applied. *See Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1005 n. 1 (3d Cir.1980).[2]

### III. PLAINTIFF'S MVFRL CLAIM

Plaintiff's first claim is brought under the Pennsylvania Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa. Cons.Stat.Ann. §§ 1701 *et seq.*, for amounts due under plaintiff's insurance contract. She seeks judgment against State Farm only. Under the MVFRL an insurer *must* provide certain benefits. Section 1711 provides in pertinent part:

An insurer issuing or delivering liability insurance policies covering any motor

---

1. Neither the location nor the circumstances of the accident are set forth in the complaint or any other papers filed with the court.

2. Plaintiff's insurance policy was apparently issued initially in Montana. A copy of the policy, however, has not been provided. Most of plaintiff's state law claims are statutory and defendant does not suggest any lack of standing.

vehicle ... shall include coverage providing a medical benefit in the amount of $10,000 ... with respect to injury arising out of the maintenance or use of a motor vehicle....

75 Pa.Cons.Stat.Ann. § 1711 (Purdon Supp. 1990). The type of medical benefits and the standard under which they must be provided is set forth in section 1712 which provides in pertinent part:

> An insurer issuing or delivering liability insurance policies ... shall make available for purchase first party benefits with respect to injury arising out of the maintenance or use of a motor vehicle as follows:
>
> (1) Medical benefit.—*Coverage to provide for reasonable and necessary medical treatment* and rehabilitative services, including, but not limited to, hospital, dental, surgical, psychiatric, psychological, osteopathic, ambulance, chiropractic, licensed physical therapy, nursing services, vocational rehabilitation and occupational therapy, speech pathology and audiology, optometric services, medications, medical supplies and prosthetic devices, all without limitation as to time, provided that, within 18 months from the date of the accident causing injury, it is ascertainable with reasonable medical probability that further expenses may be incurred as a result of the injury....

*Id.* at § 1712 (Purdon Supp.1990) (emphasis added).

The MVFRL provides for prompt payment of first party benefits upon the receipt of "reasonable proof of the amount of the benefits," [3] and for a cause of action if such payment is not made.[4] Defendants contend that plaintiff has not stated a cause of action under the MVFRL because she has not alleged that her medical treatment and bills were reasonable and necessary. In her amended complaint, plaintiff alleges, *inter alia*, that she was insured under a policy issued by State Farm, that on January 10, 1989 she suffered injuries in an automobile accident, that she sought treatment for her injuries, that in February 1989 she submitted bills to State Farm, and that "State Farm, has rejected [her] claims without medical examination, without cause, without reasonable foundation, and in an unreasonable manner." Taken in a light most favorable to plaintiff, in alleging that defendant rejected her claim without reasonable foundation, she sufficiently alleges that her claim was reasonable.

Accordingly, plaintiff adequately states a claim for benefits due under her insurance contract pursuant the MVFRL, and State Farm's motion to dismiss Count I will be denied.[5]

For the same reasons, Count VI setting forth plaintiff's breach of contract claim against State Farm, which essentially duplicates her MVFRL claim, will not be dis-

---

**3.** In its entirety, 75 Pa.Cons.Stat.Ann. § 1716 provides:

> Benefits are overdue if not paid within 30 days after the insurer receives reasonable proof of the amount of the benefits. If reasonable proof is not supplied as to all benefits, the portion supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. Overdue benefits shall bear interest at the rate of 12% per annum from the date the benefits become due. In the event the insurer is found to have acted in an unreasonable manner in refusing to pay the benefits when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee based upon actual time expended.

**4.** Section 1721 provides in pertinent part:

> If benefits have not been paid, an action for first party benefits shall be commenced with-

in four years from the date of the accident giving rise to the claim. If first party benefits have been paid, an action for further benefits shall be commenced within four years from the date of the last payment.

**5.** In so finding, the court does not accept plaintiff's principal contention that an insurer must pay all bills submitted by an insured (up to $10,000) unless it obtains a court-ordered examination under § 1796. Neither the statute nor relevant case law support this proposition. To obtain a § 1796(a) order, the insurer must show that it needs an independent examination, that the examination would substantially aid in evaluating the claim and that the information sought cannot be obtained by other means. *See State Farm Insurance Companies v. Hunt,* 390 Pa.Super. 620, 569 A.2d 365, 366–67 (1990). This, however, does not mean that a claimant who has been denied benefits is barred from bringing a MVFRL or contract claim.

missed. Plaintiff, of course, had no contract with Worldwide and does not seek damages from it for breach of contract.

## IV. PLAINTIFF'S CONSUMER PROTECTION LAW AND FRAUD CLAIMS

■ In Count II of her complaint, plaintiff alleges that defendants' conduct violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL"). The defendants argue that the Unfair Insurance Practices Act ("UIPA"), and inferentially the Pennsylvania Supreme Court decision in *D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981), bar plaintiff's CPL and common law fraud claims.

The CPL is designed to protect consumers from a number of unfair trade practices listed in the statute. *See* 73 Pa.Stat. § 201–2. A purchaser of goods or services who is injured by an unfair practice, as defined by the statute, may bring a private action for damages against the seller. *Id.* at § 201–9.2.

The UIPA was enacted in 1974 for the purpose of "regulat[ing] trade practices in the business of insurance ... by defining [unfair practices] and by prohibiting the trade practices so defined...." 40 Pa. Stat. § 1171.2. The statute authorizes the Insurance Commissioner to investigate whether insurers are in violation of the UIPA's provisions, and to conduct administrative hearings. *Id.* at §§ 1171.7 and 1171.8. The UIPA also provides for administrative and civil penalties, to be imposed by the Commissioner. *Id.* at §§ 1171.9 and 1171.11. UIPA does not expressly provide a private cause of action for violations of the statute.

In *D'Ambrosio*, the Court declined to recognize a new common law cause of action to supplement the enforcement provisions of UIPA. The plaintiff in *D'Ambro-*

*sio* sought to recover damages from his insurer for infliction of emotional distress and bad faith denial of a claim for benefits. The Court concluded that "[t]here is no evidence to suggest, and ... no reason to believe, that the system of sanctions established under [UIPA] must be supplemented by a judicially created cause of action." Accordingly, the plaintiff's action based on the insurer's alleged bad faith conduct was dismissed.

In *Layton v. Liberty Mut. Fire Ins. Co.*, 577 F.Supp. 1 (E.D.Pa.), *aff'd*, 725 F.2d 668 (3d Cir.1983), the court, through Judge Pollack, held that a plaintiff could not maintain an action under the CPL for alleged violations of UIPA. The court reasoned that, in light of several cases refusing to recognize common law causes of action, the Pennsylvania appellate courts would likely also deny a claim under the CPL. *See Layton*, 577 F.Supp. at 2. Relying on *Layton*, other judges in this district subsequently held that *D'Ambrosio* bars claims under the CPL which are within the purview of the UIPA.[6]

These cases, however, are in conflict with several Pennsylvania Superior Court decisions. In *Pekular v. Eich*, 355 Pa.Super. 276, 513 A.2d 427 (1986), *appeal denied*, 516 Pa. 635, 533 A.2d 93 (1987), the Pennsylvania Superior Court held that the UIPA does not bar a private cause of action against an insurance carrier under the CPL. Noting that the CPL has been construed liberally and that Pennsylvania courts have held violations of various other statutes to be violations of the CPL, the Court concluded:

... that there is no inherent irreconcilable conflict [which] is supported by the fact the UIPA contains no provision either stating or implying that the power vested in the Insurance Commission represents the exclusive means by which an insured's unfair or deceptive acts are to

---

6. *The 211 36th Street Condominium v. United States Fidelity and Guaranty Company*, No. 89–4867, 1989 WL 110853 (E.D.Pa. Sept. 25, 1989) (citing *Layton*); *Frank Yannessa v. Statesman Insurance Company*, No. 88–6653, 1989 WL 48098 (E.D.Pa. May 4, 1989) (citing *Layton*); *Linaras v. Bituminous Casualty Corporation*, No. 87–5060, 1988 WL 45413 (E.D.Pa. May 3, 1988) (citing *Layton*); *DeMola v. Agency Rent–A–Car*, No. 88–5485, 1989 WL 11749 (E.D.Pa. Feb. 14, 1989); *Scicluna v. The Hartford Fire Insurance Company*, No. 87–7092, 1988 WL 16981 (E.D.Pa. Feb. 26, 1988) (citing *Layton*).

be penalized or that the insured is precluded from seeking private compensation for damages incurred. Further, as noted previously, we are mindful of the fact that our Legislature did not see fit to exclude insurers, insurance agents or insurance transactions from the broad scope of CPL regulations in either the original enactment of the CPL in 1968 or, more importantly, in its subsequent reenactment in 1976, a full two years after the enactment of the UIPA.

*Id.* 355 Pa.Super. at 289–90, 513 A.2d 427. The *Pekular* decision has been followed by at least three subsequent Superior Court panels. *See Gordon v. Pennsylvania Blue Shield,* 378 Pa.Super. 256, 548 A.2d 600 (1988); *Wright v. North American Life Assurance Company,* 372 Pa.Super. 272, 539 A.2d 434 (1988); *Hardy v. Pennock Insurance Agency, Inc.,* 365 Pa.Super. 206, 529 A.2d 471 (1987).

The Eastern District cases cited above rejected *Pekular* in favor of Judge Pollack's decision in *Layton.* Judge Pollack, however, later expressly changed his position. *See Thomson v. Allstate Insurance Company,* No. 87–2666, slip op., 1988 WL 3857 (E.D.Pa. Jan. 14, 1988). In *Thomson,* the court denied defendant's motion to dismiss plaintiff's CPL claim, relying on *Pekular.*

Thus, in light of Judge Pollack's decision in *Thomson* and the continued reliance on *Pekular* by the Superior Court, the Court concludes that the Pennsylvania Supreme Court would hold that plaintiff's CPL claim is not barred by the UIPA or the decision in *D'Ambrosio.*

■ Defendant contends that even if a CPL claim is not barred, the plaintiff has not properly alleged such a claim. Defendant relies on the Superior Court decision in *Gordon, supra.* In *Gordon,* the plaintiff contended that the defendant violated the UIPA and in so doing violated the CPL. The Court noted that, in light of *Pekular,* an action under the CPL can be maintained providing that defendant's conduct rises to the level of an unfair or deceptive act or practice as defined under the CPL, 73 Pa. Stat.Ann. § 201–2(4). The Court found,

however, that the plaintiff's allegations did not rise to that level:

The only act alleged by appellant in this case was the refusal of appellee to pay benefits to which appellant felt entitled. . . .

The alleged improper refusal to act on appellee's part in this instance does not constitute actionable misfeasance. Nonfeasance alone is not sufficient to raise a claim pursuant to the Unfair Trade Practices and Consumer Protection Law. Thus, appellant's claim must fail.

*Id.* 378 Pa.Super. at 264–65, 548 A.2d 600.

In *Wright, supra,* the plaintiff alleged that the insurer "misrepresented the actual cost of the insurance policies to them, including the escalating schedule of premiums, and also misrepresented pertinent facts regarding coverage." The Court found that a CPL claim was available, citing *Pekular,* and that the plaintiff had sufficiently alleged such a claim:

Section 201–2(4)(xvii) of the [CPL] defines "unfair methods of competition" as including "engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xvii). Such general language is certainly broad enough to encompass the claims of unfair practices which have been asserted by Plaintiffs in this case. Our Supreme Court has determined that the [CPL] must be liberally construed, and that the section of the statute quoted above is a general anti-fraud provision, intended by the legislature to be a broad prohibition against a wide variety of unfair acts. *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812 (1974).

*Id.* 372 Pa.Super. at 279–80, 539 A.2d 434.

Plaintiff here claims, *inter alia,* that State Farm undertook an affirmative course of action to defraud her of benefits to which she was entitled, and misrepresented to her that medical coverage was available for injuries resulting from motor vehicle accidents without limitation for treatment of "soft tissue" injuries. The Court finds that plaintiff has sufficiently alleged a claim against State Farm under the Penn-

sylvania Unfair Trade Practices and Consumer Protection Law, and accordingly Count II will not be dismissed.

■ Plaintiff's CPL claim against Worldwide, however, will be dismissed. As stated above the CPL was designed to protect consumers from a number of unfair trade practices listed in the statute. This protection is aimed at commercial transactions between consumers and sellers, or those in the chain of supply who affirmatively mislead purchasers whose reliance was reasonable and specifically foreseeable. *See Valley Forge Towers v. Ron–Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 574 A.2d 641, 647 (1990) (finding CPL applicable to manufacturer's fraudulent warranty to intended ultimate purchaser). The Pennsylvania Supreme Court has stated:

> [T]he Consumer Protection Law was designed to equalize the market position and strength of the consumer vis-a-vis the seller. A perception of unfairness led the Legislature to regulate more closely market transactions. The mischief to be remedied was the use of unfair or deceptive acts and practices by sellers.

*Commonwealth by Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 467, 329 A.2d 812 (1974). Plaintiff's amended complaint alleges no privity at all and no commercial relationship between plaintiff and Worldwide. Plaintiff purchased her insurance policy from State Farm. She relied upon State Farm's promise of payment for certain injuries and its representations about the quality and characteristics of the coverage maintained. Worldwide was not "in any trade or commercial relationship with plaintiff sufficient to render it liable to her under the CPL." *Benjamin v. Nationwide Mutual Automobile Insurance Company*, No. 266, slip op. (C.P.Phila. Dec. 12, 1987) (CPL claim against Worldwide dismissed in similar case).

Accordingly, Count II will be dismissed as to defendant Worldwide.

■ While the Court in *D'Ambrosio* declined to supplement the UIPA with a new judicially created cause of action, it did not hold that the statute preempted prior existing common law causes of action. The Superior Court has held that the UIPA does not preclude insurance related suits for fraud or misrepresentation. *See Wright, supra; Pekular, supra.* Accordingly, defendant State Farm's motion to dismiss Count VII likewise will be denied. Count VII is premised solely on alleged misrepresentations by State Farm and does not assert a cause of action against Worldwide.

## V. PLAINTIFF'S RICO CLAIM

In Count III of her amended complaint, plaintiff alleges that the defendants violated the RICO statute, specifically § 1962(c) and § 1962(d). Defendants contend that the RICO claim is barred by the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.* Defendant Worldwide also contends that plaintiff has failed sufficiently to plead a pattern of racketeering activity.

### A. McCarran–Ferguson Pre-emption

■ The McCarran–Ferguson Act was passed in 1945 in reaction to the Supreme Court's decision in *United States v. South–Eastern Underwriter's Ass'n.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), holding that the insurance business was subject to the anti-trust laws. Congressional intent in passing the Act is set forth in § 1011 as follows:

> Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.[7]

15 U.S.C. § 1011 (1976) (footnote added).

Section 1012 provides:

> (a) The business of insurance, and every person engaged therein, shall be sub-

---

**7.** The considerations prompting the Act's passage are further summarized in *Securities & Exchange Comm'n v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969).

ject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance; *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

"Congress thus returned to the states the plenary power to regulate the business of insurance that they had enjoyed prior to the *South–Eastern Underwriter's* decision." *Cochran v. Paco, Inc.,* 606 F.2d 460, 463 (5th Cir.1979).

Although the scope of the Act is broader than the antitrust area,[8] McCarran Act jurisprudence overwhelmingly involves the Act's application in the antitrust context. To determine whether a particular antitrust claim is barred by the McCarran–Ferguson Act, the court must decide (1) whether the challenged practice is part of the "business of insurance" and (2) whether it is "regulated by state law." *McIlhenny v. American Title Insurance Company,* 418 F.Supp. 364, 367 (E.D.Pa.1976). If the answer to both inquiries is yes, then the claim is barred.

The *McIlhenny* analysis was applied to a RICO claim in *Richhart v. Metropolitan Life Insurance Company,* No. 89–1725, slip op., 1990 WL 39268 (E.D.Pa. Mar. 30, 1990). In *Richhart,* the RICO claim was premised on alleged misrepresentations by the defendant insurance company. It was undisputed that the activity in question involved the business of insurance. The court found that the activity in question was sufficiently regulated by state law, specifically the UIPA, and held that the plaintiff's RICO claim was barred by the McCarran–Ferguson Act.

A closer reading of the Act, however, suggests that a somewhat different approach may be more appropriate. "It is clear that 15 U.S.C. § 1012(b) contains two distinct clauses.... The first sentence is intended to make state law supreme in any conflict with federal law unless Congress clearly expresses its intent to cover the insurance industry with a particular statute. The proviso deals specifically with the application of the antitrust laws." *In re Workers' Compensation Insurance Antitrust Litigation,* 574 F.Supp. 525, 528 n. 4 (D.Minn.1983).

Thus, the Act provides that the Sherman Act, the Clayton Act, and the Federal Trade Commission Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). Other federal statutes shall not be "construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." *Id.*[9]

In determining whether § 1012(b) barred a claim under the Truth in Lending Act, the Fifth Circuit applied the following four-part test: (1) whether the federal statute "specifically relates to the business of insurance," (2) whether the challenged activities constitute the "business of insurance,"

---

8. For example, state tax laws relating to the business of insurance are expressly covered by 15 U.S.C. §§ 1011 & 1012, and the National Labor Relations Act and the Fair Labor Standards Act are made specifically applicable to the business of insurance in § 1014. "Congress was clearly concerned with the overall regulatory picture, including 'collection of premiums, general regulations, the issuing of licenses, and many other aspects of the business.'" *Cochran*

*v. Paco, Inc.,* 606 F.2d 460, 463 (5th Cir.1979) (quoting 91 Cong.Rec. 481–82 (1945) (remarks of Senator Radcliffe)).

9. The court in *Richhart* relied on *FTC v. Nat'l. Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958) which involved the FTCA and thus was expressly controlled by the § 1012(b) proviso.

(3) whether the state has enacted any law for the purpose of regulating such activities, *and* (4) whether the federal statute would "invalidate, impair, or supersede such state law." *See Cochran,* 606 F.2d at 464 (citing *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *Lowe v. Aarco–American, Inc.,* 536 F.2d 1160 (7th Cir.1976)).[10]

In *Washburn v. Isidore Brown,* No. 81–C–1475, slip op., 1986 WL 7062 (N.D.Ill. June 16, 1986), the court relied on *Cochran* to determine whether the McCarran–Ferguson Act barred plaintiff's RICO claim. Plaintiff alleged that defendants engaged in a scheme to defraud the policyholders of an insurance company by affirmatively concealing its insolvency from state regulators and others. The court reasoned that:

> The initial question is whether RICO "specifically relates to the business of insurance" within the meaning of 15 U.S.C. § 1012(b). If it does, the inquiry is at an end and RICO applies. If it does not, the court must determine whether the challenged activities constitute "the business of insurance" for purposes of section 1012(b). If they do not, RICO applies. If they do, the court must determine whether Illinois has enacted any law for the purpose of regulating such activities. If it has not, RICO applies. If it has, the court must decide whether RICO would invalidate, impair, or supersede such state law.

The Court finds that this is the most appropriate analysis to utilize in determining whether § 1012(b) bars a non-antitrust, non-FTCA claim.

First, it is clear that RICO does not specifically relate to the business of insurance within the meaning of § 1012(b). The court next must determine whether the activities challenged in the present case are part of the "business of insurance," and if they are regulated by the Commonwealth.

The Supreme Court addressed the "business of insurance" element in the context of activities similar to those involved here. *See Union Labor Life Insurance Co. v.*

*Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). In *Pireno,* the plaintiff chiropractor brought an action under the federal antitrust laws against an insurance company and a professional association of chiropractors, challenging the company's peer review process. In determining whether treatment was "necessary" and whether charges were "reasonable," the insurance company relied on the advise of the association's Peer Review Committee. The Committee found a number of plaintiff's charges to be unreasonable and some of his treatment to be unnecessary. Plaintiff challenged these findings and filed an action claiming that the peer review practices violated § 1 of the Sherman Act.

The Court applied three criteria to determine whether a particular practice is part of the "business of insurance": (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and, (3) whether the practice is limited to entities within the insurance industry. *Id.* The Court held that an insurer's use of peer review to evaluate policyholders' claims for benefits was not part of the "business of insurance." *Id.* at 134, 102 S.Ct. at 3011. *See also Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (provider agreements negotiated to carry out policy obligations not part of "business of insurance").

As to the first factor, the Court observed that use of a peer review committee plays no part in " 'spreading and underwriting a policyholder's risk.' " *Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009 (quoting *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979)). The Court noted that risk is transferred by means of the insurance policy and that the transfer is complete when the contract is entered into. *Id.* As to the second factor, the Court viewed the use of peer review committees

---

**10.** Significantly, the Court in *National Securities,* which involved the Securities Exchange Act of 1934, applied the "invalidate, impair or supersede" provision of § 1012(b).

as separate arrangements between insurers and third parties. *Id.* 458 U.S. at 131–32, 102 S.Ct. at 3009–10 (*citing Royal Drug, supra,* 440 U.S. at 215, 99 S.Ct. at 1075). As to the final factor, the Court observed that use of a peer review committee involves third parties wholly outside the insurance industry. *Id.* 458 U.S. at 132–34, 102 S.Ct. at 3010–11.

The dissent viewed the peer review committee as essentially the insurer's claims adjuster, and viewed claims adjustment as an integral part of the relationship between the insurer and the insured and therefore a part of the "business of insurance." *Id.* at 136–40, 102 S.Ct. at 3012–14 (Rehnquist, J., dissenting). The majority rejected this view because the committee's evaluation was nonbinding, and viewed the use of peer review as ancillary to the claims adjustment process. *Id.* at 134 n. 8, 102 S.Ct. at 3011 n. 8.

That the "auditing service" in the present case is not exactly the same as the not-for-profit type of organization involved in *Pireno* is insufficient to distinguish the two cases. Indeed, defendants do not attempt to make such a distinction.

Pennsylvania has enacted a law to regulate peer review activity. *See* 75 Pa.Cons. Stat. § 1797(b), as amended by Act No. 1990–6. Pursuant to § 1797(b), insurers must contract with a peer review organization (PRO) to evaluate the necessity and reasonableness of health care services. The evaluation of a PRO is binding upon the insurer and insured, subject to the right to seek reconsideration by the PRO and, if disappointed, to seek court review. Thus, unlike the peer review process in *Pireno,* peer review in Pennsylvania is not merely advisory. When benefit claims are subject to mandatory peer review by a PRO whose evaluation is binding, subject

only to a court appeal, the peer review process is integral to the insurer-insured relationship and becomes part of the "business of insurance." The effective date of § 1797(b), however, is April 15, 1990, subsequent to virtually all of the activity complained of.[11]

Finally, the court will examine whether the RICO claim in question would "invalidate, impair, or supersede" any state insurance related law. Defendants' McCarran–Ferguson arguments are based on the Act's *proviso,* applicable to antitrust and FTCA cases. They do not address the question of whether plaintiff's claim would require the court to construe or apply RICO in a way that would "invalidate, impair, or supersede" state law.

The court can identify no state law that would be invalidated or superseded if RICO claims such as plaintiff's are permitted to proceed.[12] Arguably, the availability of a RICO-fraud action premised on a denial of medical benefits could impair the viability of § 1797(b). The Commonwealth has mandated a process for the evaluation and payment or rejection of such benefit claims which could be circumvented, prejudiced or undermined if disappointed claimants can pursue alternatives.[13] Theoretically, any time a claimant is denied benefits he contends he is clearly entitled to, he can allege that he was defrauded of such benefits. The application of RICO to an alleged conspiracy of participants in the peer review process to undermine the integrity of that process, however, would seem to supplement rather than supplant state law. Moreover, § 1797(b) was not in effect when virtually all of the conduct complained of allegedly occurred, and the challenged review process here was a voluntary, nonbinding one.

---

**11.** Constitutional challenges to § 1797(b) have been initiated. *See Pennsylvania Medical Society v. Foster,* —— Pa.Cmwlth. ——, 585 A.2d 595 (Pa.Commw.1991); *Pennsylvania Chiropractic Federation v. Foster,* —— Pa.Cmwlth. ——, 583 A.2d 844 Misc. No. 148 (Pa.Commw.1990); *Pennsylvania Medical Providers Ass'n. v. Foster,* —— Pa.Cmwlth. ——, 582 A.2d 888 (Pa.Commw. 1990).

**12.** Because of the nature of RICO, which encompasses an infinite variety of activity, a meaningful § 1012(b) determination can only be made by assessing the particular RICO claim at issue.

**13.** "Impair" means to damage, injure, diminish, prejudice, undermine or weaken. *See* Webster's Ninth New Collegiate Dictionary (1988); Webster's Collegiate Thesaurus (1976).

Theoretically, the fact that the UIPA does not bar insurance related state law fraud claims, *see Wright, supra,* does not mean that the availability of such causes of action would not impair the UIPA within the meaning of § 1012(b). If they would so impair the state law, then presumably so would insurance related RICO-fraud claims. The court finds, however, that the maintenance of plaintiff's RICO claim would not impair the UIPA.

Accordingly, the court concludes that plaintiff's RICO claim is not preempted by the McCarran–Ferguson Act.

### B. Failure to State a RICO Claim

Defendant Worldwide also contends that plaintiff has failed to state a RICO claim because she has not set forth a sufficient pattern of racketeering activity. Plaintiff asserts claims under 18 U.S.C. § 1962(c) and § 1962(d). Section 1962(c) provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to make out a claim under § 1962(c), plaintiff must allege (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct of affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity that must include at least two racketeering acts. *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989).

Section 1962(d) provides:

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

In order to plead a conspiracy, plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the actions of the alleged conspirators which were taken for that purpose. *Shearin, supra,* at 1166.

### 1. *Pattern of Racketeering Activity*

■ Defendant contends that plaintiff has failed to allege a pattern of racketeering activity. "Racketeering activity" within the meaning of RICO includes state law crimes such as murder, bribery and extortion, which are punishable by imprisonment for more than one year, and federal crimes including mail fraud, wire fraud and securities fraud. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten year period. *Id.* at § 1961(5). In *Sedima,* the Court stated that:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

In determining the existence of a sufficient pattern, the Third Circuit has adopted a multi-factor approach. The factors include: (1) the number of unlawful acts, (2) the length of time over which they were committed, (3) the similarity of the acts, (4) the number of victims, (5) the number of

perpetrators, and (6) the character of the unlawful activities. *Barticheck v. Fidelity Union Bank/First Nat. State*, 832 F.2d 36, 39 (3d Cir.1987).

In addition, "a plaintiff ... must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell*, 492 U.S. 229, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Continuity can be shown by a series of related predicates extending over a substantial closed period of time or by related predicates that "themselves include a specific threat of repetition extending indefinitely into the future." *Id.* 109 S.Ct. at 2902. The Third Circuit has stated that it is "reluctant to embrace" the interpretation of continuity as discussed in *H.J., Inc.* as solely a temporal concept.

> Virtually every garden variety fraud is accomplished through a series of wire or mail fraud acts that are related through purpose and are spread over a period of at least several months. Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time.

*Marshall–Silver Construction Co. v. Rendell*, 894 F.2d 593, 597 (3d Cir.1990). The Court concluded that it was "unlikely that Congress intended RICO to apply in the absence of a more significant societal threat." *Id.*

The plaintiff has alleged violations of the federal mail and wire fraud statutes. 18 U.S.C. §§ 1341 and 1343. The mail fraud statute provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... [and] for the purposes of executing such scheme ... places in any post office ... any matter to be sent or delivered by the

Postal Service ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The elements necessary to sustain a charge of mail fraud are: "(1) [T]he existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the Postal Service to execute the scheme." *United States v. Burks*, 867 F.2d 795, 797 (3d Cir.1989). The elements of wire fraud are similar. *See In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1249 (3d Cir. 1989) (same elements provide basis for both mail and wire fraud); *United States v. Pritchard*, 773 F.2d 873, 876 (7th Cir.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986).

A "scheme to defraud" is not defined according to any technical standards. *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978). The scheme need not be fraudulent on its face, but "must involve the sort of fraudulent misrepresentations or omissions *reasonably calculated to deceive persons of ordinary prudence and comprehension.*" *Id.*

Plaintiff appears to allege two schemes to defraud. The first is a scheme whereby State Farm knowingly misrepresented to prospective policyholders the availability of certain benefits, i.e., payment for treatment of injuries, including soft tissue injuries, sustained in vehicular accidents. State Farm allegedly intended *ab initio* to limit or decline payment for the treatment of soft tissue injuries whether or not such treatment was justified. In furtherance of this alleged scheme, State Farm mailed various applications and insurance policies.

Plaintiff also alleges that State Farm and Worldwide collaborated to reduce or refuse payments for treatment of soft tissue injuries regardless of the merits of the claims for such payments. Worldwide allegedly would evaluate such claims adversely in return for a contingency fee from State Farm which would then utilize the evaluations to support its refusal to pay the insured or provider. In furtherance of this alleged scheme, State Farm would mail re-

quests for evaluations as well as payments to Worldwide, and the latter would mail evaluations of claims to State Farm. This practice allegedly continued over a six-year period and victimized virtually every State Farm insured who was treated for soft tissue injury after a motor vehicle accident.

The court finds that plaintiff has alleged a pattern of mail fraud sufficient to withstand a motion to dismiss.[14]

### 2. *RICO Enterprise*

■ A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact though not a legal entity," 18 U.S.C. § 1961(4). To establish the existence of a RICO enterprise, a plaintiff must show (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and (3) that the enterprise is separate and apart from the pattern of activity in which it engages. *See Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 789–90 (3d Cir.1984); *United States v. Riccobene*, 709 F.2d 214, 221 (3d Cir.1983).

■ For purposes of § 1962(c), the RICO defendant and the RICO enterprise must be distinct and separate. *U.S. v. Turkette*, 452 U.S. 576, 582, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *Rose v. Bartle*, 871 F.2d 331, 358 (3d Cir.1989); *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir.1988); *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987); *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633 (3d Cir.1984). The combination of a corporation and its employees does not constitute an enterprise. *See Newfield v. Shearson*

*Lehman Bros.*, 699 F.Supp. 1124, 1127 (E.D.Pa.1988). *See also Roberts v. Tandy Corp.*, 1990 WL 69090, 1990 U.S.Dist. LEXIS 6208 (E.D.Pa.1990).

■ In the present case, plaintiff alleges that "State Farm and Worldwide, individually and in association with each other, constitute enterprises as defined by 18 U.S.C. Section 1961(4)." That is, plaintiff alleges three enterprises: (1) State Farm, (2) Worldwide, and (3) the association of State Farm and Worldwide. Clearly, State Farm and Worldwide are not enterprises within the ambit of § 1962(c). While plaintiff could have been more precise in her description, she has alleged an association in fact of the two sufficient to withstand a motion to dismiss.

Accordingly, defendants' motions to dismiss Count III will be denied.

## VI. PLAINTIFF'S FEDERAL CIVIL RIGHTS CLAIMS

In Count IV, plaintiff asserts claims under the federal Civil Rights Act, 42 U.S.C. §§ 1983 and 1985. She alleges that defendants, acting under color of state law, the MVFRL, deprived plaintiff of property, that is insurance benefits, without due process of law, and that defendants conspired to interfere with her civil rights. Defendants move to dismiss these claims on the grounds that defendants, private entities, did not act under color of state law within the meaning of § 1983, and that plaintiff has not alleged any race or class-based discriminatory conduct as required by § 1985(3).[15]

### A. Plaintiff's Section 1983 Claim

■ Section 1983 provides a cause of action against a party who "under color of" state law deprives another of rights or

---

**14.** Plaintiff alleged that defendants used "the U.S. mail, interstate wire and telephone systems and other systems of interstate commerce." She sets forth types of mailings, if not specific uses of the mails. Plaintiff, however, does not allege that any interstate telephone calls were made in furtherance of the alleged scheme. Intrastate calls, albeit on an interstate wire system, do not qualify as predicate acts under

RICO. *See Gruber v. Prudential Bache Securities*, 679 F.Supp. 165 (D.Conn.1987).

**15.** While plaintiff does not specify in her complaint which subsection of § 1985 she bases her claim on, she makes clear in her brief that she is relying on § 1985(3). In any event, § 1985(1) and (2) do not even remotely apply to the fact pattern alleged.

privileges secured by the Constitution or federal law. Thus, to sustain a claim under § 1983, a plaintiff must show: (1) a deprivation of a right "secured by the Constitution and the laws" of the United States, and (2) deprivation of that right "under color of" state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 (1978).[16]

Two tests have been utilized to determine whether state action exists, the public function test and the close-nexus test. The relevant inquiry under the former is whether "the function performed has been 'traditionally the exclusive prerogative of the State.'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982).[17] That a private entity performs a function which serves the public does not make its conduct "state action." *Id.*

Private insurance companies provide an important service. They do not, however, perform a public function which was formerly "the exclusive prerogative of the State." *See Flagg Bros.,* 436 U.S. at 157–161, 98 S.Ct. at 1733–36.

Under the close-nexus test, the relevant inquiry is whether there is a sufficiently close connection between the State and the challenged action so that the action may be fairly treated as that of the State itself. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1975), citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972). The Supreme Court later refined this approach in *Lugar v.*

*Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Lugar court divided state-action analysis into two parts:

> First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

457 U.S. at 937, 102 S.Ct. at 2753–54.[18]

Plaintiff relies on the three-judge panel decision in *Baksalary v. Smith,* 579 F.Supp. 218 (E.D.Pa.1984). At issue in *Baksalary* was the Pennsylvania Workmen's Compensation Act automatic supersedeas provision which terminated benefits upon an insurer's averment that the worker had returned to work at comparable wages or that a doctor's affidavit affirmed the worker's recovery. The panel held that plaintiffs, workers who lost their benefits without notice or hearing, were deprived of a constitutionally protected property interest in the continued receipt of their benefits. *Id.* at 224–25.

In determining that this deprivation was accomplished by state action, the panel employed the two-prong *Lugar* analysis. First, the court found that the insurer exercises a state created right or privilege when it terminates or suspends benefits without notice. The Commonwealth required continuing payments unless the insurer qualified for a supersedeas. To qual-

---

**16.** Plaintiffs here complain that defendants have denied them due process rights guaranteed by the Fifth Amendment. The Fifth Amendment, however, applies only to the federal government. The court assumes that plaintiff meant to refer to the Fourteenth Amendment which applies to the states and state actors. "State action" for purposes of the Fourteenth Amendment and "color of state law" for the purposes of section 1983 are identical. *Robinson v. Canterbury Village, Inc.,* 848 F.2d 424, 427 n. 3 (3d Cir.1988).

**17.** *Rendell–Baker* involved a teacher's suit against her former employer. The employer, a school for maladjusted high-school students, received virtually all its income from state or

local governmental authorities. Under a Massachusetts statute, these authorities had an obligation to provide special education through private schools where public schools were not equipped to do so. The Court found the relationship between the government authorities and the school insufficient to support a finding of state action.

**18.** *Lugar* involved a challenge to a Virginia prejudgment attachment statute. Acting upon the petition of a private creditor, a clerk of the state court issued a writ of attachment and the county sheriff executed the writ. The Court found sufficient state involvement in this process to support a finding of state action.

ify for the supersedeas, the insurer had to file a petition which was reviewed by state officials for compliance.

The panel then found that the filing and review process required by the automatic supersedeas provision was sufficient to constitute "joint participation" and transform the private insurer into a state actor. *Baksalary*, 579 F.Supp. at 230–32. The Court in *Lugar* held that joint participation occurred when a private party invoked the "aid of state officials to take advantage of state-created attachment procedures." *Lugar*, 457 U.S. at 942, 102 S.Ct. at 2756. The panel in *Baksalary* found that the state filing and review process constituted joint participation. 579 F.Supp. at 231–32.

Assuming that an insurer exercises a right granted by the MVFRL when it pays or rejects claims for medical benefits, there is no state filing and review process of the type involved in *Baksalary*. The Supreme Court's decision in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) is more on point.

In *Blum*, the Court considered a challenge to the procedures by which New York nursing homes determined whether to transfer Medicaid patients from higher-care to lower-care facilities. A state statute permitted a private board of doctors to determine if a Medicare recipient required less intensive care. If the doctors made this determination, the nursing home would transfer the patient to a less care-intensive facility.

The Court found no state action even though (1) most institutions received large amounts of state funding, (2) the state closely regulated the institutions, and (3) the state typically adjusted patients' Medicaid benefits on the basis of the nursing homes' transfer decisions. The Court stressed that the state never reviewed the transfer decision. The state received notice of the transfer, but only decided whether or not to adjust the patient's Medicare benefits. *Id.* at 1010, 102 S.Ct. at 2789. The panel in *Baksalary* distinguished *Blum* on this basis.[19]

Plaintiff in the instant case argues that because the administration of the MVFRL is delegated largely to insurers and because applications for benefits must be submitted to carriers on forms mandated by the Pennsylvania Insurance Department, there is joint participation. Accepting plaintiff's contentions, they do not amount to the "aid of state officials." *Lugar, supra.* There must be active encouragement or coercion by the State. *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785. State laws that dictate procedures, forms, or even penalties without dictating the challenged action do not convert private action into state action. *Id.* at 1010, 102 S.Ct. at 2789.

In the present case, the decisions to refer claims to Worldwide for assessment and to refuse payment were made and executed by State Farm without any state involvement. Plaintiff has not sufficiently alleged that defendants acted under color of state law, and therefore defendants' motions to dismiss plaintiff's § 1983 claim will be granted.

**B. Plaintiff's Section 1985 Claim**

Plaintiff also alleges that in conspiring to reject her benefit claims, defendants interfered with her civil rights in violation of 42 U.S.C. § 1985(3). Defendants contend that plaintiffs claim must be dismissed because she has failed to allege a sufficient "class-based discrimination."

In contrast to § 1983, which provides a cause of action for the violation of any constitutional right, § 1985(3) provides a

---

**19.** The panel stated *"Blum* ... leaves open the question whether, had New York reviewed the transfer decision, New York would then have been deemed, for Fourteenth Amendment purposes, to be a joint participant in the transfer decision. *See also Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 354–355, 95 S.Ct. 449, 453, 455–456, 42 L.Ed.2d 477 (1974) (specifically distinguishing a termination of electricity service with state approval from a termination initiated according to procedures approved by the state in a general tariff); *Community Medical Center v. Emergency Medical Services,* 712 F.2d 878, 881 (3rd Cir.1983) (noting the Supreme Court's distinction between "direct" and "indirect" involvement)." *Baksalary,* 579 F.Supp. at 231 n. 20.

cause of action only when the plaintiff's right to equal protection, privileges or immunities is violated. *Jennings v. Shuman,* 567 F.2d 1213, 1221 (3d Cir.1977). To maintain a claim under 42 U.S.C. § 1985(3), plaintiff must be able to show a conspiracy motivated by a racial or class-based animus. *Burt v. Ferrese,* 871 F.2d 14, 17 (3d Cir.1989); *Pratt v. Thornburgh,* 807 F.2d 355, 357 (3d Cir.1986), *cert. denied,* 484 U.S. 839, 108 S.Ct. 125, 98 L.Ed.2d 83 (1986) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

What constitutes a class for § 1985(3) purposes has not been definitively decided. It is clear, however, that the scope is very narrow. Indeed, the Supreme Court has stated that it is "a close question" whether § 1985(3) was intended to reach any class-based animus other than that against blacks. *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. 825, 837, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983). Section 1985(3) "has never been held to apply to private, economically motivated conspiracies." *C & K Coal Co. v. United Mine Workers of America,* 704 F.2d 690, 700 (3d Cir.1983).

In the present case, plaintiff's theory is that defendants have discriminated against her as a member of a class of insureds who have "sustained 'soft tissue' injuries in motor vehicle accidents." Such persons do not constitute a "class" and are not victims of "historically pervasive discrimination." They are not a protected group within the ambit of § 1985(3). *See Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *Bauge v. Jernigan,* 669 F.Supp. 348 (D.Colo.1987).

Accordingly, defendants' motions to dismiss plaintiffs § 1985(3) claim will be granted.

## VII. WORLDWIDE'S EXEMPTION ARGUMENT

 Defendant Worldwide contends that it is exempt from all civil liability in this case under the Pennsylvania Insurance Consultation Services Act, 40 Pa.Stat.Ann. §§ 1841 *et seq.* (1981). The Act provides that insurers, their agents and service contractors are exempt generally from civil liability arising out of their providing insurance consultation services. Insurance consultation services are defined as "[a]ny survey, consultation, inspection, advisory or related services performed by an insurer, its agents, employees or service contractors incident to an application for insurance, a new policy of insurance, or an existing policy of insurance for a purpose of reducing the likelihood of injury, death or loss." 40 Pa.Stat.Ann. § 1841 (1981).

The civil liability exemption section provides a general rule and three exceptions:

(a) Exemption.—The furnishing of, or failure to furnish, insurance consultation services related to, in connection with or incidental to a policy of insurance shall not subject the insurer, its agents, employees or service contractors to liability for damages from injury, death or loss occurring as a result of any act or omission by any person in the course of such services.

(b) Application of section.—This section shall not apply:

(1) if the injury, loss or death occurred during the actual performance of consultation services and was caused by the negligence of the insurer, its agent, employees or service contractors which was a proximate cause of the injury, death or loss.

(2) To any consultation services required to be performed under the provisions of a written service contract not incidental to a policy of insurance.

(3) In any action against any insurer, its agents, employees or service contractors for damages caused by the act or omission of said insurer, its agents, employees or service contractors in which it is judicially determined that such act or omission constituted a crime, actual malice or gross negligence.

40 Pa.Stat.Ann. § 1843 (1981).

The services provided by Worldwide clearly were aimed at reducing State Farm's costs after an injury has been sus-

tained by an insured and not at reducing the likelihood of death, injury or loss to the insured in the first place.[20] Arguably, "loss" within the meaning of the Act includes economic loss to the insurer. The Act's policy statement, however, clearly suggests that its objective is to promote services which can reduce injury and loss to the insured, not the insurer. The policy statement provides: "The general assembly finds that it is in the public interest to encourage insurers to provide consultation services with the goal of reducing injury, death or loss and to limit the civil liability of insurers for such activity." Clearly· if the insurers are being encouraged to "provide" services to reduce injury then they should be providing these services "to" some other party—that is, the insured.

The Court concludes that an insurance consultation service within the meaning of the Pennsylvania Insurance Consultation Services Exemption Act is a service provided for the purpose of reducing the likelihood of injury, death or loss *to the insured.* The Court finds that, under the circumstances alleged in the complaint, Worldwide was not performing insurance consultation service within the meaning of the Act.

 Moreover, even if Worldwide were providing an insurance consultation service generally exempt under § 1843(a), the facts alleged here would bring its conduct within the § 1843(b) exceptions. Section 1843(b)(3) provides an exception where the consultation service provider, whether it be the insurer or its service contractor, acted criminally, with gross negligence or with malice. Plaintiff's allegations of fraud are sufficient to trigger the application of this exception.

 Also, it is uncontroverted that plaintiff never received written notice of the Act's exemption provisions, and therefore the Act would be inapplicable in this case. Section 1843(c) provides:

(c) notice.—The provisions of subsection (a) shall not be effective and applica-

ble unless the insurer furnishes the insured with written notice of the provisions of this act. Such notice shall be provided the insured by the insurer at the time the policy is issued or written and at each subsequent renewal thereof. The manner in which the notice shall be given and its specific contents shall be approved by the insurance commissioner.

Accordingly, Worldwide's exemption argument will be rejected.

## VIII. PLAINTIFF'S CLAIM FOR EQUITABLE RELIEF

Plaintiff seeks to enjoin the submission by State Farm of medical expenses for soft tissue injuries to Worldwide or any other peer review service, and the utilization by defendants of any "secret schedule" of limited benefits for such injuries. The plaintiff must show that her right to relief is clear, that there is impending a real threat of injury, that she has no adequate legal remedy and that the balance of equities favors relief. *See Roe v. Operation Rescue,* 919 F.2d 857, 867 n. 8 (3d Cir.1990); *People of State of Illinois v. City of Milwaukee,* 599 F.2d 151, 165 (7th Cir.1979); *Holiday Inns of America, Inc. v. B & B Corporation,* 409 F.2d 614, 618 (3d Cir. 1969). *See also* Wright & Miller, Federal Practice and Procedure: Civil § 2942 at 368–70.

 Plaintiff correctly contends that the MVFRL does not preclude the award of equitable relief. It does not follow, however, that every denial of a claim by an insurer justifies such exceptional relief.

 Plaintiff has not alleged that she has any current or continuing need for medical treatment as a result of her accident, let alone treatment which cannot be obtained unless benefit payments are forthcoming. She does not allege that she has any other soft tissue injury related claims pending with State Farm or even that she is insured by State Farm, or any other

---

**20.** Neither the parties nor the Court could find any case applying or even citing this Act, al-
though it became effective ten years ago.

insurer which utilizes the services of Worldwide.

The legal causes of action for full payment plus interest, costs and exemplary damages pled by plaintiff provide an adequate remedy at law for the injury she has alleged. Moreover, the relief plaintiff seeks would undermine the defendant insurer's ability to comply with state law. *See* 75 Pa.Cons.Stat. § 1797(b). This not only affects the balance of equities between the parties, but also implicates public policy.

## IX. CLASS CERTIFICATION

Plaintiff defines the class it seeks to represent as all persons who have ever had medical benefit claims for vehicle accident related injuries denied, in whole or in part, by defendants since 1984. This would encompass persons in numerous states with varied contract, fraud and insurance laws, and claims that would appear to be barred by statutes of limitations. There is no delineation of the type of injuries or expenses, or of the reason for denial of the claims. Thus, persons whose claims were rejected because they never received the treatment billed for or because they received treatment not recognized as legitimate by the medical profession or because the expenses incurred were excessive or double-billed, along with others in differing factual circumstances, would be included.

It is difficult for the court to conclude at this time that the maintenance of such litigation in this or any other single forum is desirable, to assess the problems likely to be encountered in the management of such an action or generally to determine whether a class action is the most fair and efficient way to adjudicate this controversy. Given the scope of the proposed class, it is difficult for the court to determine at this time whether common questions of fact and law would predominate.

Defendants have not questioned the appropriateness of class certification or of the class definition set forth in paragraph 33 of plaintiff's complaint. The burden is on the plaintiff, however, adequately and accurately to define an appropriate class, and generally to establish a right to maintain a class action. *See* Wright & Miller, Federal Practice and Procedure: Civil § 1798 at 424. A court may defer decisions about class certification and the proper scope of any class, and may consider facts procured through discovery in making a final determination. *See Goodman v. Lukens Steel Co.*, 777 F.2d 113, 125 (3d Cir.1985); *Link v. Mercedes–Benz of North America*, 550 F.2d 860, 864 (3d Cir.), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *McLaughlin v. Wohlgemuth*, 535 F.2d 251, 252 n. 1 (3d Cir.1976); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 759–64 (3d Cir.1974); *Peil v. National Semiconductor Corp.*, 86 F.R.D. 357, 365 (E.D.Pa. 1980).

The court will enter a scheduling order providing for an appropriate period of discovery. The plaintiff will have sixty days to show that this case is properly maintained as a class action and, if so, to define or redefine an appropriate class. The defendants will have two weeks thereafter to file any response.

Appropriate orders will be entered.

### ORDER

AND NOW, this 31st day of January, 1991, upon consideration of defendant State Farm Mutual Insurance Company's Motion to Dismiss and plaintiff's response thereto, IT IS HEREBY ORDERED that said Motion is GRANTED in part and DENIED in part, in that Counts 4 and 5 are DISMISSED as to defendant State Farm and Counts 1, 2, 3, 6 and 7 will not be dismissed.

### ORDER

AND NOW, this 31st day of January, 1991, upon consideration of defendant Worldwide Auditing Service's Motion to Dismiss and plaintiff's response thereto, IT IS HEREBY ORDERED that said Motion is GRANTED in part and DENIED in part, in that Counts 2, 4 and 5 are DISMISSED as to defendant Worldwide and Count 3 will not be dismissed.